**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No._____- Civ

**AVROHOM BRASHEVITZKY,**
**MARIA ALEJANDRA DURAN, and**
**TOTAL CYCLING MECHANICAL**
**CORP.,** *individually and on behalf*
*of all others similarly situated*,

     **Plaintiffs,**

**vs.**

**COVANTA HOLDING**
**CORPORATION, COVANTA DADE**
**RENEWABLE ENERGY, LLC, EQT**
**INFRASTRUCTURE**
**CORPORATION, and EQT**
**INFRASTRUCTURE V**

     **Defendants.**

_____

**CLASS ACTION COMPLAINT WITH JURY DEMAND FOR**
**DAMAGES, REMEDIATION, AND MEDICAL MONITORING**

     Plaintiffs Avrohom Brashevitzky, Maria Alejandra Duran, and Total Cycling Mechanical Corp., individually and on behalf of all others similarly situated in Miami-Dade County, Florida, and South Florida, sue Covanta Holding Corporation, Covanta Dade Renewable Energy, LLC, EQT Infrastructure Corporation, and EQT Infrastructure V ("Defendants" or "Covanta"), and respectfully represents the following:

**PARTIES**

1.    Plaintiff Avrohom Brashevitzky is a resident and domiciliary of Miami-Dade County, Florida. He is an owner of real property located at 5353 NW 109th Court, Doral, FL 33178. Rabbi Brashevitzky is a well-respected local religious leader. He a husband and the father of 10 children. He, his wife, and those of his children who have been present at his residence at all times pertinent herein, have uniquely and commonly complained of and/or clinically suffered from various symptoms of upper and lower respiratory tract distress, headaches, and other unnatural and otherwise inexplicable malaise. Upon information and belief such complaints and symptoms are proximate to and caused by the Defendants' acts and/or omissions. He brings this action on behalf of himself and all others similarly situated.

2.      Plaintiff Maria Alejandra Duran is a resident and domiciliary of Miami-Dade County, Florida. She leases real property located at 7805 NW 104th Avenue, #31, Doral, FL 33178. Maria Alejandra Duran is a well-respected local resident. She is the mother of an 11-year-Bold boy. She cares for her 80-year-old mother. Both her mother and her son have resided with her at all times pertinent hereto. She, her minor son, and mother, have uniquely and commonly suffered from various symptoms of upper and lower respiratory tract distress, headaches, and other unnatural and otherwise inexplicable malaise. Upon information and belief such symptoms are proximate to and caused by the Defendants' acts and/or omissions. She brings this action on behalf of herself and all others similarly situated.

3.      Plaintiff Total Cycling Mechanical Corp. is a Florida for profit company with a principal place of business in Miami-Dade County, Florida located at 10181 NW 58th St., #1, Doral, FL 33178. This bicycle sales and repair establishment is a well-respected locally owned and operated small business. The officers, directors, employees and/or invitees of Plaintiff Total Cycling Mechanical Corp. many of whom have been within the demised premises at all times pertinent herein, have uniquely and commonly suffered from and/or expressed suffering from various symptoms of upper and lower respiratory tract distress, headaches, and other unnatural and otherwise inexplicable malaise. The business *per se,* which is in significant part dependent upon walk-in customer foot traffic, has suffered from a diminution of such necessary unique customer visits causing an instant and ongoing financial loss, the precise amount(s) of which are impossible to ascertain at this time. Upon information and belief such physical symptoms and loss of foot traffic and revenue are proximate to and caused by the Defendants' acts and/or omissions. It brings this action on behalf of itself and all others similarly situated.

4.      Defendant Covanta Holding Corporation is a corporation formed under Delaware law domiciled in New Jersey, with a global headquarters located at 445 South Street, Morristown, New Jersey 07960. It may be served through its registered agent for service of process, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5.      Defendant Covanta Dade Renewable Energy is a Florida limited liability company with its principal place of business in Florida and located at 6990 NW 97th Avenue, Doral, Florida, 33178, authorized to do and doing business in the State of Florida. It may be served

through its registered agent for service of process, CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

6.      Defendant EQT Infrastructure Corporation is a foreign juridical entity domiciled in the State of Delaware. It may be served through its agent for service of process, Interstate Corporation Services Delaware Ltd., 200 Bellevue Parkway, Suite 210, Wilmington Delaware 19809.

7.      Defendant EQT Infrastructure V is a foreign juridical entity that is domiciled in the State of Delaware. It may be served through its agent for service of process, Interstate Corporation Services Delaware Ltd., 200 Bellevue Parkway, Suite 210, Wilmington Delaware 19809.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(1), (d)(2), in that this matter is filed by representatives similarly situated to others; the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs; and Plaintiffs, the proposed class representatives, are citizens of the State of Florida; and there exists minimal diversity between the citizenship of Plaintiffs, members of the putative class, and Defendants.

9.      Venue is proper in this district under 28 U.S.C. §1391 (b)(2), and/or (d) as to all Defendants, as all Defendants have had longstanding and numerous purposeful economic contacts and engaged in commercial activity in Miami-Dade County, Florida in the operation of, amongst other things, waste-processing facilities which are under Defendants' care, custody, and/or control, and the tortious activity alleged herein has taken place within Miami-Dade County, Florida.

10.     Personal jurisdiction is properly exercised over Defendants as a substantial part of the events, omissions, and culpable conduct giving rise to the claims took place in Miami-Dade County, Florida which is located within this Southern District of Florida. Defendants have derived economic benefits and revenue from their business arrangements and purposeful conduct within this district and have made decisions that have had tortious consequences in this district.

## FACTUAL ALLEGATIONS

11.     Since February 12, 2023, a trash fire and/or secondary fire(s) have burnt and continue to burn at the above-mentioned Resources Recovery Facility in Doral, Florida,

Miami-Dade County, and parts of an adjacent landfill located in Medley, Florida, and a public drop-off Chemical Collection Station adjacent thereto known as the "Home Chemical Drop-Off Facility" in Doral, Florida on NW 58th Street.

12.     According to the Miami-Dade County, Florida official Solid Waste Department web site, the physical location where the fire(s) have been burning toxic and/or hazardous materials from February 12, 2023 through the filing of this Complaint, began commercial operations in 1985, nominally under or in contract since that time with Defendants and/or their legal predecessors in interest.

13.     The "Covanta Resources Recovery" plant is largely comprised, amongst other things, of piles of publicly and privately dumped unsorted and sorted hazardous, toxic, and/or other mounds of trash, demised physical structures/buildings, mechanical equipment therein and thereupon, as well as vehicles and other heavy machinery, and is putatively located upon or in, and is upon information and belief the property of and owned by Miami-Dade County, Florida, located within the City of Doral municipal limits, with a legal address according to the official web site of "Covanta Dade Renewable Energy LLC/Covanta Lee, 6990 NW 97th Ave., Doral, FL 33178" (known hereinafter, and as from time to time as may be amended, as the "Facilities").

14.     The Facilities' function is, amongst other things, a critical component of a process which produces the partial transformation of solid waste "trash to cash" into some form of recyclable energy. Such trash would otherwise be primarily dumped untreated and in various hazardous and toxic states into an adjacent or abutting Landfill or landfills.

15.     The same official Miami-Dade County website acknowledges that as of the time of the filing of this Complaint, the fire(s) continue to uncontrollably burn, and are releasing potentially toxic and hazardous materials.

16.     Measurement and management or reporting of any hazardous and/or toxic emissions has been suspiciously ceded in whole by Miami-Dade County government to the Defendants; the testing sites, methodology and results of which would arguably favor Defendants to the detriment of Plaintiffs in diminishing any liability, misfeasance, malfeasance, or criminal activity on the part of Defendants.

17.     According to another official Miami-Dade County Solid Waste Department web site, the 77-megawatt Facilities is operated by and in the care, custody and/or control of

Defendants "Covanta Energy" through a contractual agreement or agreements with Miami-Dade County, Florida.

18.    The Facilities, which allegedly processes more than 1 million tons of waste annually, is supported by two proximate and virtually geographically indistinguishable Miami-Dade County, Florida owned (but in some cases in whole or part otherwise operated by third parties) landfills, a co-located ash monofil, and three solid waste transfer stations (mini-landfills and waste reception stations).

19.    Until approximately 1990, the geographical situs of the landfills or Landfill was wholly unincorporated Miami-Dade (then Dade) County, Florida area. Arbitrary incorporations thereafter created artificial boundaries, establishing municipal subdivisions of the county which exist generally unaltered to this day.

20.    Miami-Dade County, Florida designated the Facilities as an "Area or Facility of Countywide Significance" (AFCS). This means the City of Doral, Florida has no legal authority to pass any ordinance banning or affecting the operation of the Facilities.

21.    Therefore, Miami-Dade County, Florida, and those entities in privity of contract thereto such as Defendants have exclusive and unfettered care, custody and/or control over the Facilities.

22.    Waste delivered to the plant is allegedly processed in two separate operations: one for garbage, which is food waste or other items that come out of the kitchen; and one for trash, which can include yard waste, furniture, fixtures, and other similar waste items.

23.    Upon information and belief, delivered or stored waste contains toxic and/or hazardous materials which remain undetected unless and until they are segregated out for recycling and/or onward burial at other landfill or transfer sites, if at all.

24.    On the garbage side, ferrous and non-ferrous metals are recovered for recycling. These materials are sold to outside vendors and are a source of recycling credit for the County. The remaining garbage is shredded to produce refuse-derived fuel, which is used to generate electricity. Toxic and/or hazardous material is or was segregated, stored, and quite likely burned or is burning in the fire(s) if not converted or otherwise removed or buried.

25.    On the trash side, the material is supposed to be sorted and shredded. Magnets separate recyclable ferrous materials and high-grade soil is removed through a series of trommels. If not removed, toxic and/or hazardous materials remain on site pending disposition, and likely has burned in the fire(s) at the Facilities.

26.     The ash product resulting from the waste-to-energy process is 10 percent of the original waste-material volume delivered to the plant. This ash is placed in a monofill – a specially constructed landfill used only for ash located next to the plant.

27.     Upon information and belief, prior to proper segregation and/or separation, toxic and/or hazardous trash accumulates at the Facilities, and even after segregated, may be stored, or warehoused at the Facilities until removed to other proper landfill facilities or transfer stations.

28.     Any fire(s) would have necessarily involved, spewed, and combusted any such segregated, accumulated and/or otherwise stored toxic and/or hazardous trash awaiting removal, all of which was upon information and belief *in situ* at the time of the fire(s). This had and has the real potential of exponentially exacerbating and increasing the amount of combustible hazardous and/or toxic emissions from the present hazardous and/or toxic trash found not apt for recycling or otherwise segregated awaiting recycling or other disposal or removal, as well as the combustion of hazardous and/or toxic material expended by first responders and others in the extinguishing of the fire(s), all of which materials and substances were and are being spewed into the air, ground and water tables as vapors, ash, runoff, and fumes.

29.     This "trash to cash" business is not a virtuous or not-for-profit endeavor. Much to the contrary. Power generated at the facility is sold to a private company and thereafter supplied to the Florida regional electrical grid. This amount of energy is sufficient to operate the plant and to supply the electrical needs of approximately 35,000 homes.

30.     This is a multi-million-dollar profit center nourishing political contributions, political consultants, lobbyists, and others, all advocating the interests of the operators of the Facilities as opposed to the putative victims of the acts and/or omissions of the Defendants.

31.     Revenue generated from the sale of the electricity is shared equally between Miami-Dade-County and the Defendants. Miami-Dade County's portion of the revenue is allegedly meant to be used to somehow assure Defendants an operating profit by offsetting the Facility's operational costs and to meet the community's disposal needs.

32.     But something went or is terribly wrong, and the fire(s) have injured and will in perpetuity injure innocent victims such as the Plaintiffs and the putative class.

33.     That Resources Recovery Facility is in all reality, in layman's terms, a mini-public municipal waste landfill (or euphemistically a "transfer station") located in Miami-Dade County, Florida, designed for the reception and accumulation of trash for landfill disposal and/or burial, recycling processing, or re-burial or integration into other landfills, all destined for immediately adjacent landfills located in large part in the municipalities of Doral and Medley, Florida. These landfills, once a unitary "Mount Trashmore" has been artificially divided by a theoretical east-west bifurcation known as NW 74th Street now in large part essentially dividing the cities of Doral and Medley, Florida ("Landfill").

34.     The City of Doral portion of the Landfill or landfill, and the Medley landfill has located upon it, is co-located with, is connected to, and/or is situated in close proximity to that certain Resources Recovery Facility, the facilities, the Facilities, the burning recyclable waste-processing facilities and potentially hazardous and/or toxic trash that were and are under Defendants' sole care, custody, and/or control.

35.     On information and belief, the Landfill and Facilities, are operated as independent enterprises outside of governmental scrutiny and oversight by the third parties under contract, notwithstanding being owned in whole or in part by Miami-Dade County, Florida.

36.     The Facilities are now or have for decades, upon information and belief, been operated under the unfettered and virtually unregulated care, custody and/or control of the Defendants by virtue of contract(s) which have from time to time been entered into, *inter alia*, by and between Miami-Dade County, Florida, and Defendants, and/or their respective successors and/or assigns.

37.     On information and belief, Miami-Dade County, Florida has entrusted the operation, administration, and/or control of the Facilities to Defendants.

38.     On information and belief, Defendants have entered into one or more contracts with Miami-Dade County, Florida governing the operation of the Facilities.

39.     On information and belief, the Facilities processes certain categories of generally or independently collected public waste for the purpose of processing and the ultimate conversion of the segregated trash into renewable energy.

40.     A significant portion of the Facilities are dedicated to the separation and storage for further disposal of hazardous and toxic trash from generally collected trash and other allegedly pre-sorted recyclable trash. Such intentionally separated and legally unrecyclable hazardous and toxic waste, including plastics, garbage, chemicals and chemical containers,

drugs, trash, and other potentially highly toxic waste that cannot be safely burned and may (or should) have been set aside in a sorting process. That hazardous and/or toxic waste is or should be subsequently disposed of into the Landfill or elsewhere.

41.    However, unless and until such segregated and/or unsegregated toxic and/or hazardous trash is properly disposed of, it is and was at all times material hereto, upon information and belief, present in or on the Landfill and/or Facilities, and is likely to have burned and is currently burning in the fire(s) active to the date of this Complaint at or on the Landfill, landfills, and/or Facilities, and is or are contributing to or is a manifestation of tortious acts and/or omissions of Defendants.

42.    On information and belief, the burning or other conversion of the waste at the Facilities by Defendants generates forms of renewable energy, however, the burning of accumulated toxic and/or hazardous trash is intuitively poisonous to Plaintiffs, animals, and others, and the acts and/or omissions of Defendants have harmed and continue to harm Plaintiffs.

43.    On information and belief, waste is delivered to the Facilities, Landfill, and/or landfills to or by Defendants and is then separated and/or segregated by Defendants or under their care, custody and/or control at the Facilities, landfill and/or landfills.

44.    On information and belief, waste that is fit for incineration is processed by Defendants at the Facilities and the remainder is set aside by Defendants or otherwise deposited by Defendants in the Landfill. If at the time of the fire(s) such hazardous and/or toxic trash found unsuitable for recycling was left segregated and lying about and accumulating, but not transported elsewhere or placed into a landfill of the Landfill, such intentionally segregated toxins and/or hazardous material may have been incinerated or converted in physical form and chemical structure during the fire(s).

45.    On information and belief, beginning on or around February 12, 2023, uncontrolled fire(s) erupted at the Facilities and spread elsewhere within or upon the Landfill due to the actions or omissions of Defendants. From that date until the date of this Complaint, the fire(s) have been burning and continuously emitting known and unknown, documented and undocumented, reported and unreported, noxious, hazardous, toxic, injurious, and otherwise harmful chemical substances and particulate matter ("hazardous substances").

46.     On information and belief, these hazardous and/or toxic substances have been released into the air, soil, and water table from the Facilities and consequently the Landfill, which has become an unfettered and spewing toxic-waste engine.

47.     On information and belief, the release of these hazardous and/or toxic substances have been uncontrolled, unregulated, and unlicensed.

48.     On information and belief, Defendants do not have the requisite permitting under federal, state, or local laws and regulations to emit hazardous, toxic, untreated, or noxious fumes, smoke, or odors into the environs.

49.     This ongoing generation of hazardous materials and/or toxins is due to, amongst other things, the uncontrolled and errant incineration and release of gaseous, liquid, and solid manifestations of the contents of the Facilities and the Landfill, including, on information and belief, waste that is unfit and unsuitable for incineration or even storage in a non-toxic landfill. The burning of the collected waste and the demised premises, and the demolition of same in the course of fire-suppression efforts, as well as the consequences of fire-suppression efforts, have exacerbated the situation, producing visible plumes of thick black noxious smoke, amongst other discharges.

50.     Toxins and/or hazardous materials emanating from the fire(s) have indiscriminately and uncontrollably migrated and been dispersed throughout Miami-Dade County, Florida and virtually all adjoining South Florida environs and neighborhoods. Defendants' actions or inactions have caused harmful and unwanted exposure to or a significant risk of exposure to hazardous and toxic substances to the Plaintiffs, as well as all other similarly situated inhabitants ("putative class members"), within a certain geographical boundary—to be determined after appropriate class testing—in Miami-Dade County and throughout South Florida.

51.     The exposure to toxic or hazardous smoke, fumes, and odors like the kind released by Defendants through the fire(s) at the Facilities and Landfill can cause and has caused for the individual Plaintiffs and the putative class members, myriad physical symptoms. These symptoms include rash, skin irritation, breathing difficulty, shortness of breath, irritation of the eyes, irritation of the throat, irritation of the nasal passages, chest pain, and dysphagia.

52.     The visible discharge of massive plumes of smoke from the Facilities and landfill has caused fear, stress, and anxiety to Plaintiffs and the putative class members. Plaintiffs are

concerned about the effects of the continual discharge on their bodies, their drinking water, and their environment.

53.     Plaintiffs and the putative class members have no practical way to shield themselves from the harmful contents in the air or water placed there by the Defendants' negligent and unreasonable conduct.

54.     Plaintiffs and the putative class members have in common that they—more likely than not—have been exposed to toxic fumes and other discharges from the fire(s) burning at the Facilities and landfill. These affected individuals included some combination of the following:

    a.     property owners residing in the affected areas of Miami-Dade County, Florida and South Florida, and the family members of such property owners who were or are present during the relevant time period;

    b.     residential or commercial lessees who have leaseholds in the affected areas of Miami-Dade County, Florida and South Florida, and the family members (of residential lessees) who were or are present during the relevant time period;

    c.     first responders and other governmental employees who were or are present in the affected areas of Miami-Dade County, Florida, and South Florida during the relevant time period;

    d.     residential or commercial invitees in the affected areas of Miami-Dade County, Florida and South Florida who were or are present during the relevant time period;

    e.     residents in Miami-Dade County, Florida, and South Florida, who, in their normal and everyday activities, have been exposed to the noxious and toxic plumes of smoke and chemical pollution that have been negligently created by the operation of the Facilities and Landfill; and

    f.     residents in Miami-Dade County, Florida, and South Florida whose normal everyday activities were disrupted by the smoky conditions created by the fire(s) or who were cautioned by government officials to limit their exposure to the discharge resulting from the conflagration caused by Defendants' acts and omissions.

55.     The fire(s) have generated toxic fumes, particulates, and liquids that have come into contact with and are continually trespassing on the property of Plaintiffs and all other similarly situated persons within Miami-Dade County, Florida, and South Florida.

56.     Further, on information and belief, the Facilities and Landfill have emitted toxic chemicals that cannot be seen or smelled. These dangerous emissions cause known and unknown health risks to all who come into contact with the discharged effluents, by-products, and toxic substances, visible and invisible, known and unknown, which are contained within the cloud, smoke, particulate matter, liquids, and other toxic discharges.

57.     The fire(s) are allegedly burning, to some extent, as of the filing of this Complaint.

58.     The hazardous and toxic substances within the plume(s) of smoke, particulate matter, and within the air or liquid effluent therefrom are generally carried or disbursed in an expansive geographic area by wind and ground water table or aquifers. The continued emissions not only magnify the exposure, but also heighten the long-term impacts on those subjected to it, including Plaintiffs and the putative class members.

59.     This lawsuit seeks to have a class certified to—at a bare minimum—conserve judicial resources by allowing the class of affected people to have a single trial on liability, including—amongst other tortious acts—Defendants' acts or omissions that caused the initial fire(s) to erupt.

60.     The sequelae of the initial fire(s) have caused harm to Plaintiffs and to all putative class members.

61.     Irrespective of individual damages, which may or may not vary to such an extent that common relief is possible through the class mechanism, it is not in dispute that all putative class members have an identical need and right to ascertain and demonstrate common underlying facts, causation, and liability that give rise to their respective causes of action against common Defendants, all resulting from exposure to hazardous substances. The damages incurred by Plaintiffs and the putative class members include property damage, testing and remediation of their property, diminished property values, disruption of their quiet enjoyment of their property, emotional damages for the fear, anxiety, stress, and general disruption of their lives caused by the fire(s), and medical monitoring of their persons.

62.     The class mechanism is the most obvious and efficient way to allow Plaintiffs and the putative class to discover any common ill-effects of the exposure to the toxic smoke, cloud,

plume, and liquid effluents, to alleviate or reduce the risk of the likelihood that the toxic smoke, cloud, plume, or liquid effluents will harm them if they remain in Miami-Dade County, Florida, and South Florida.

63.     The class mechanism is also the most efficient method to determine if Plaintiffs and the putative class members will benefit from medical monitoring, and if so, the parameters of said medical monitoring.

64.     The class mechanism is likewise the most efficient path to ascertain the extent of pollution caused by Defendants and a comprehensive remediation plan with costs associated therewith, for similarly contaminated properties.

65.     The class mechanism is also most efficient to determine liability and whether Defendants acted in a manner justifying punitive damages against them for damages they have caused Plaintiffs and the putative class members.

66.     According to public documentation provided by the United States Department of Health and Human Services, Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry ("ATSDR"), chronic contamination has been known to negatively affect the physical and psychosocial health and safety of people.

67.     ATSDR recognizes that affected communities such as Miami-Dade County and South Florida, which were previously forced to litigate in *Miranda vs. Waste Management, Inc. of Florida*, Civil Action No. 20-23257-Civ-Scola, Sd.Fl. (to protect and preserve other violated rights at the adjacent Medley, FL landfill), has resulted in distrust founded in "a community's perceptions, history, needs, and challenges."

68.     ATSDR's mission statement sets out that a transparent approach to meet the community's needs are critical and necessary to resolve the legitimate health and welfare concerns of an affected class of plaintiffs. Thus, the class mechanism is the only logical way to impose injunctive relief for Plaintiffs and the putative class so they can avoid being victims of future joint ventures between Defendants and government representatives.

69.     Depending on what initial discovery reveals in the course of class certification, Plaintiffs specifically reserve the right to amend this Complaint.

**CLASS ALLEGATIONS**

70.     Plaintiffs bring claims under Fed. R. Civ. P. 23 on behalf of a class of similarly situated persons and entities. Plaintiffs initially proposes the following class definition:

**All owners, lessees, or tenants of real property and business owners in Miami-Dade County or an adjacent municipality or county as of February 12, 2023.**

71.     Excluded from the Class are (1) Defendants and any of their affiliates, parents, or subsidiaries; all employees of Defendants; all persons who make timely election to be excluded from the Class; government entities' and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates who claims for damages regarding the February 12, 2023 fire(s) arise out of subrogation (equitable, contractual, or otherwise).

72.     Also excluded from the Class are any claims of physical manifestation of personal or bodily injury.

73.     Plaintiffs reserve the right to propose additional or more refined classes or subclasses in connection with their motion for class certification, and as determined by the Court in its discretion.

74.     The Classes satisfy the requirements of Rule 23(a) and Rule 23(b) and there are no interclass conflicts.

75.     **Ascertainability:** The number and identity of Class members can be easily ascertained. The proposed Class includes residents, property owners, and businesses within distinct geographical boundaries, whose persons and property were wrongfully exposed to hazardous substances. The Class members may be identified by property records and other public records and may be notified of this action through standard methods.

76.     **Numerosity:** The members of the Class are so numerous that joinder of all members is impractical. According to the 2020 Census, there are 2.7 million residents of Miami-Dade County alone.

77.     **Commonality:** Plaintiffs and the putative class members were all injured by the administration, operation, and management of the Facilities and Landfill. There are common questions of law and fact that predominate over any questions affecting only individual class members including, but not limited to, the following:

   a.     Whether Defendants' acts and omissions caused the fire(s);

   b.     Whether Defendants' acts and omissions caused the dispersal of hazardous substances;

   c.     Whether Defendants' acts and omissions contaminated the surrounding air, water, or soil;

d.      The precise chemicals that exist in the smoke and resulting contamination of the environment;

e.      The costs to treat or remediate contamination resulting from the fire(s);

f.      Whether Defendants' acts and omissions caused property values to diminish in the affected geographic region;

g.      Whether property damages have occurred to homes or businesses in the affected geographic region;

h.      Whether Defendants' acts and omissions caused Class members to incur expenses for displacement from their homes, jobs, and businesses;

i.      Whether Defendants' acts and omissions have created a nuisance (public, private, or statutory);

j.      Whether Defendants' acts and omissions resulted in trespass to real property;

k.      Whether Defendants' acts and omissions resulted in trespass to personal property;

l.      Whether Defendants' acts and omissions caused inconvenience to the Class members by disrupting their daily lives;

m.      Whether Plaintiffs and the Class members are entitled to medical monitoring to facilitate early detection of diseases known to be associated with hazardous materials or toxic chemicals released into the air, water, or soil as a result of Defendants' acts and omissions;

n.      Whether Defendants are liable to Plaintiffs and the Class members for punitive damages resulting from the fire(s) and its aftermath; and

o.      Whether Plaintiff and the Class members are entitled to injunctive relief.

78.    **Typicality:** Plaintiffs seek injunctive relief for testing, remediation, and medical monitoring as well as damages to real and personal property. Their claims are typical of the claims of the members of the Class. Plaintiffs and the Class members have been injured by Defendants' same wrongful acts and omissions. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

79.    **Adequacy of Representation:** Plaintiffs are representatives who will fully and adequately assert and protect the Class's interests and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys

have any interests contrary to or in conflict with the Class. Plaintiff Avrohom Brashevitzky is a respected and well-known community leader. Plaintiff Maria Alejandra Duran is a respected community member. Plaintiff Total Cycling Mechanical Corp. is a well-established local small-business keenly aware of the commercial pulse of its community.

80.     Proposed co-lead class counsel Perry R. Sanders, Jr. has extensive experience in mass torts and has been appointed as lead class counsel in both state and federal courts. He has never been denied such designation by any court upon petition for appointment.

81.     Local Counsel and proposed co-lead class counsel Bruce C. Kaplan has extensive community ties having served as a twice elected Miami-Dade County Commissioner, is knowledgeable about the citizens and history of Miami-Dade County, and, will petition for Mr. Sanders's admission *pro hac vice*.

82.     **Rule 23(b)(2):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and that require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rule 23(b)(2).

83.     **Rule 23(b)(3):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirement for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation. The amount of damages available to most putative class members is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class-action procedure. The costs of litigating individual cases are unrealistic for individual members to bear. Class members share a common interest in achieving a group remedy for the harms they have endured. Thus, the individual claimants' interest in controlling their claims separately is subordinate to the Class's interests in pursuing a collective remedy (as evidence by the lack of individual claims filed to the undersigned's knowledge following reasonable investigation). Individualized litigation also presents the potential for inconsistent of contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class-action device presents far fewer case-management difficulties and provides the benefits of a single

adjudication, economy of scale, and comprehensive supervision by a single court. There are no untoward or extraordinary challenges in managing this dispute as a class action.

## Count 1: Negligence

84.     Defendants have operated the Facilities in a negligent and unreasonable fashion over a period of time, including, but not limited to February 12, 2023, and through the date of the filing of this Complaint.

85.     Defendants had a duty to use reasonable care to operate the Facilities including, including, but not limited to, the following duties:

    a.    Operating, maintaining, inspecting, and/or repairing machinery and equipment to ensure their safety and proper operation;

    b.    Ensuring that combustible and/or hazardous and/or toxic waste did not catch fire;

    c.    Guarding against the accumulation of combustible and/or hazardous and/or toxic waste;

    d.    Segregating combustible and/or hazardous and/or toxic waste to minimize risk of combustion;

    e.    Ensuring proper documentation and implementation of regulatory controls to identify those items of waste that posed a heightened risk of combustion and segregate those items for other waste items that, if ignited, present a potential danger of releasing toxic and/or hazardous substances;

    f.    Ensuring adequate fire-suppression equipment was onsite to swiftly extinguish any fire(s);

    g.    Ensuring proper safety procedures to quickly address and suppress any flames;

    h.    Having an adequate number of staff onsite to ensure safe operations;

    i.    Hiring, training, managing, and supervising agents and employees (including those onsite at the time of the fire(s);

    j.    Properly determining the qualifications and responsibilities of agents and employees;

    k.    Properly determining the adequacy and skill of agents and employees;

    l.    Adequately warning those in danger of exposure to hazardous materials and/or toxic chemicals;

m.   Instituting proper procedures and alarms to identify and address any fire(s);

n.   Instituting proper procedures and training for response to fire(s), and that noxious fire suppression chemicals or liquids would not exacerbate the emission of hazardous and/or toxic fumes, material, ash, or other substances harmful to human or other life;

o.   Timely implementing an emergency-response plan in the event of a fire;

p.   Handling potentially hazardous materials or toxic chemicals to prevent them from catching fire;

q.   Complying with landfill and solid-waste-incineration regulations promulgated by the State of Florida and the United States Environmental Protection Agency; and

r.   Accurately advising of the risk of catastrophic injury and illness from exposure to hazardous materials or toxic chemicals released as a result of the fire(s).

86.   Defendants breached their duties to Plaintiffs and the Class members relative to the operation of the Facilities in at least the following ways:

a.   Failing to operate, maintain, inspect, and/or repair machinery and equipment to ensure their safety and proper operation;

b.   Failing to ensure that combustible waste did not catch fire;

c.   Failing to guard against the accumulation of combustible waste;

d.   Failing to segregate combustible waste to minimize risk of combustion;

e.   Failing to ensure proper documentation and implementation of regulatory controls to identify those items of waste that posed a heightened risk of combustion and segregate those items for other waste items that, if ignited, present a potential danger of releasing hazardous and/or toxic substances;

f.   Failing to ensure adequate fire-suppression equipment was onsite to swiftly extinguish any fire(s);

g.   Failing to ensure proper safety procedures to quickly address and suppress any flames;

h.   Failing to have an adequate number of staff onsite to ensure safe operations;

i.   Failing to hire, train, manage, and supervise agents and employees (including those onsite at the time of the fires);

j.      Failing to properly determine the qualifications and responsibilities of agents and employees;

k.      Failing to properly determine the adequacy and skill of agents and employees;

l.      Failing to adequately warn those in danger of exposure to hazardous materials or toxic chemicals;

m.      Failing to institute proper procedures and alarms to identify and address any fire(s);

n.      Failing to institute proper procedures and training for response to fire;

o.      Failing to timely implement an emergency-response plan in the event of a fire;

p.      Failing to handle potentially hazardous materials and/or toxic chemicals to prevent them from catching fire;

q.      Failing to comply with landfill regulations promulgated by the State of Florida and the United States Environmental Protection Agency; and

r.      Failing to accurately advise of the risk of catastrophic injury and illness from exposure to hazardous materials or toxic chemicals released as a result of the fire(s).

87.    The harm to Plaintiffs and the Class members was caused or exacerbated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with their operations.

88.    As a direct and proximate result of Defendants' release of potentially hazardous materials, toxic chemicals, and noxious fumes into the air, water, and soil, Plaintiffs' and the Class members' properties were, and are being physically invaded by Defendants' discharges.

89.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class members suffered property damages, including physical injury to their property.

90.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class members suffered inconvenience, fear, anxiety, distress, and other emotional injuries.

91.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class members suffered and will continue to suffer the loss of the quiet use and enjoyment of their properties.

92.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, diminution in value of real estate.

## Count 2: Trespass to Real Property

93.     The reckless, negligent, and unreasonable conduct of Defendants and their failure to act reasonably at the Facilities has resulted in the discharge of toxic, noxious, and dangerous smoke, fumes, and odors.

94.     These discharges have harmed Plaintiffs and the putative class members through invading their real property.

95.     These discharges have also harmed Plaintiffs and the putative class members through contamination of the water table, air, and soil by effluent discharges.

96.     This tortious contact with Plaintiffs' and the putative class members' property is unauthorized and constitutes a trespass.

97.     Defendants' trespass has caused damages to Plaintiffs and the putative class members through the loss of use and enjoyment of their land.

98.     Defendants' trespass has caused damages to Plaintiffs and the putative class members through contamination of their real property.

99.      Defendants' trespass has caused damages to Plaintiffs and the putative class members through diminishing the value of their real property.

100.    Plaintiffs and the putative class members are entitled to recover damages caused by Defendants' trespass to real property.

101.    Plaintiffs and the putative class members are entitled to remediation of their property and medical monitoring of their person at the Defendants' cost due to Defendants' negligent and substandard conduct.

## Count 3: Trespass to Personal Property

102.    Defendants intentionally interfered with Plaintiffs' and the putative class members' personal property without justification or authority.

103.    Plaintiffs and all putative class members had a possessory interest in all of their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, professional equipment, recreational equipment, livestock, and pets.

104.    Defendants' discharge of hazardous substances impaired the condition, quality, or value of Plaintiffs' and the putative class members' personal property for a substantial time.

105.    Through the acts and omissions described above, Defendants caused harm to personal property in which Plaintiffs and the putative class members had a legally protected interest.

106.    As a direct and proximate result of Defendants' misconduct, Plaintiffs and the putative class members suffer and will continue to suffer decreased property values, damage to their personal property, lost wages, loss of business income, and loss of business goodwill.

**Count 4: Private Nuisance**

107.    Defendants' discharge of hazardous substances, including toxic, noxious, and dangerous smoke, fumes, and odors, has created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property.

108.    The presence of the same toxic and noxious smoke that has drifted onto the individual Plaintiffs' and the putative class members' persons and infiltrated potable and other waterflows and supplies also constitutes a continuing nuisance and continuing trespass to Plaintiffs' and the putative class members' property.

109.    Defendants knew or should have known that the toxic discharge and noxious smoke and odors it was releasing were hazardous to human beings and real property, and that it was substantially certain that improper transportation, handling, and disposal of such materials would injure Plaintiffs, putative class members, and their property.

110.    Defendants' toxic discharge of hazardous and/or toxic substances would reasonably annoy and disturb an ordinary person, as shown by, for example, the community outrage in response to the toxic discharge and noxious smoke and odors, and the interest in the impact of those hazards on Plaintiffs and putative class members, as well as on the local environment.

111.    Defendants' discharge of hazardous and/or toxic, noxious, and dangerous smoke, fumes, and odors has disturbed Plaintiffs' and putative class members' free use, possession, and enjoyment of their property.

112.    Defendants' discharge of hazardous and/or toxic, noxious, and dangerous smoke, fumes, and odors has rendered physically uncomfortable Plaintiffs' and putative class members' ordinary use and occupation of their property. Defendants' contamination of Plaintiffs' and putative class members' property with toxic substances has caused them to refrain from using or occupying their property. It has caused Plaintiffs to refrain from using

contaminated water for drinking, cooking, bathing, or irrigation. This has caused significant loss of income, out-of-pocket expense, and inconvenience.

113.    Plaintiffs and putative class members suffered and continue to suffer a harm and injury to their residential and commercial properties to which they did not consent, and which is different from the type of harm suffered by the general public.

114.    Defendants' contamination of Plaintiffs' and putative class members' property with smoke, fumes, odors, toxic and/or hazardous substances has substantially interfered with Plaintiffs' and putative class members' ability to enjoy their property, avail themselves of their property's value as an asset or source of collateral for financing, or to use their property in the manner that they so choose. It has also caused a reduction in the value of their land.

115.    Defendants' actions described above were unreasonable and have deprived Plaintiffs and putative class members of the free use and enjoyment of their property.

116.    Plaintiffs and the putative class members, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct including the contamination of their land and water.

117.    Defendants' improper discharge of smoke, fumes, and odors, and the contamination of Plaintiffs' property and putative class members' property resulting therefrom, constitutes a private nuisance.

118.    Plaintiffs and putative class members suffer and will continue to suffer decreased property values, damage to their real and personal property, lost wages, loss of business income, and loss of business goodwill.

### Count 5: Public Nuisance

119.    Defendants' discharge of toxic and/or hazardous substances, including toxic, noxious, and dangerous smoke, fumes, and odors, has created conditions that are harmful to health and interfere with the comfortable enjoyment of life and property. As a result of Defendants' actions and inactions, Plaintiffs and putative class members have suffered a permanent loss of use and enjoyment of their property.

120.    Defendants knew or should have known that the smoke, fumes, odors, and substances they discharged were hazardous and/or toxic to human beings, animals, and real property. It was substantially certain that improper handling of such materials would injure people in the surrounding communities.

121.    Plaintiffs and the putative class members have a common right to enjoy their real property free from dangerous contamination, to breathe clean air, have access to clean running water without dangerous levels of contamination, and to live their lives without unreasonable exposure to toxic smoke, fumes, odors, and hazardous substances.

122.    Defendants, through their negligent, reckless, or intentional acts and omissions described above, substantially, and unreasonably infringed upon and transgressed these public rights.

123.    As a direct and proximate result of Defendants' improper discharge of hazardous substances, including hazardous and/or toxic, noxious, and dangerous smoke, fumes, and odors, Plaintiffs', the putative class members', and the general public's common right to breathe clean air and have access to clean water without dangerous levels of hazardous and/or toxic contamination was severely diminished, if not entirely eliminated.

124.    As a direct and proximate result of Defendants' discharge of hazardous substances, Defendants invaded and contaminated the areas surrounding Plaintiffs' and putative class members' residences and businesses, thus exposing them to toxic smoke, fumes, and odors, and other contaminants.

125.    Defendants' toxic discharge also affect and continue to affect the public at large, causing massive environmental damage to the surrounding area.

126.    Defendants' conduct is a substantial factor in causing Plaintiffs and the putative class members to suffer and to continue to suffer harm, injury, and losses, including physical injury to property, loss of use and enjoyment of their property, and diminution in property values, lost wages, loss of business income, and loss of business goodwill.

### Count 6: Statutory Nuisance

127.    United States Environmental Protection Agency ("EPA") regulations prohibit incinerating waste in a manner that produces certain emission levels of particulate matter under 2.5 microns in size. 40 C.F.R. § 60.2010, *et seq*.

128.    On information and belief, emissions readings conducted in and around the Facilities since February 12, 2023, have detected levels of particulate matter under 2.5 microns in size that exceed EPA regulations, reaching levels that are deemed unhealthy for sensitive groups, unhealthy, very unhealthy, and hazardous.

129.    On information and belief, Defendants are aware that emissions readings show excessive amounts of particulate matter that are not safe for residents but have not taken appropriate action to prevent further unsafe emissions of particulate matter.

130.    The Florida Department of Environmental Protection ("FDEP") is responsible for regulating air pollution caused by open burning within the state of Florida.

131.    FDEP rules and regulations, including Rule 62-256.300, F.A.C., prohibit igniting, causing to be ignited, or permitting to be ignited certain prohibited materials for open burning. These prohibited materials include biological waste, hazardous waste, asbestos-containing materials, mercury-containing devices, pharmaceuticals, tires, rubber material, residual oil, used oil, asphalt, roofing material, treated wood, plastics, garbage, or trash.

132.    Even when open-burning permits are issued, the open burning may not involve any prohibited materials listed in Rule 62-256.300, F.A.C.

133.    On information and belief, Defendants have been burning one or more of these prohibited materials, including but not limited to plastics, garbage, and trash at the Doral Incinerator Plant since February 12, 2023.

134.    Under FDEP regulations, including Rule 62-296-320, F.A.C., no person shall cause, suffer, allow, or permit the discharge of air pollutants which cause or contribute to an objectionable odor.

135.    Defendants have continuously caused, suffered, allowed, and permitted the discharge of air pollutants at the Facilities, which has caused an objectionable odor to surrounding residents.

136.    As a direct and proximate result of Defendants' failure to follow the referenced EPA and FDEP regulations, Plaintiffs and Class members and their properties have been exposed to potentially hazardous materials, toxic chemicals, and noxious fumes into the air, water, and soil.

137.    As a direct and proximate result of Defendants' failure to follow the referenced EPA and FDEP regulations, Plaintiffs and the Class members suffered property damages, including physical injury to their property.

138.    As a direct and proximate result of Defendants' failure to follow the referenced EPA and FDEP regulations, Plaintiffs and the Class members suffered inconvenience, fear, anxiety, distress, and other emotional injuries.

139.    As a direct and proximate result of Defendants' failure to follow the referenced EPA and FDEP regulations, Plaintiffs and the Class members suffered and will continue to suffer the loss of the quiet use and enjoyment of their properties.

140.    As a direct and proximate result of Defendants' failure to follow the referenced EPA and FDEP regulations, Plaintiffs and the Class members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, diminution in value of real estate.

141.    As a direct and proximate result of Defendants' failure to follow the referenced EPA and FDEP regulations, Defendants invaded and contaminated the areas surrounding Plaintiffs' and putative class members' residences and businesses, thus exposing them to toxic smoke, fumes, and odors, and other contaminants.

142.    Defendants' conduct is a substantial factor in causing Plaintiffs and the putative class members to suffer and to continue to suffer harm, injury, and losses, including fear, anxiety, distress, emotional injury, physical injury to property, loss of use and enjoyment of their property, and diminution in property values, lost wages, loss of business income, and loss of business goodwill.

## Count 7: Injunctive and Equitable Relief

143.    An actual, justiciable controversy exists between Plaintiffs and the Class members, and Defendants. A judgment from this Court regarding these issues would afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations of the parties.

144.     Defendants had and have a duty to use reasonable care not to enter, invade, or intrude on Plaintiffs' or the Class members' real property. Defendants also owed a duty to Plaintiffs and the Class members to exercise reasonable care in handling Defendants' operations at the Doral Incinerator Plant.

145.    Defendants breached these duties by negligently, wantonly, carelessly, or recklessly conducting their operations and failing to promptly remediate any fire caused by Defendants' acts or omissions, which led to injuries to Plaintiffs' and Class members' properties and may have exposed them to hazardous substances.

146.    Plaintiffs and the Class members have an adverse legal interest to Defendants. This adverse interest and the controversy that exists between the parties can be resolved through the specific relief sought.

147.    Plaintiffs, individually and on behalf of the Class members, request that the Court issue an Order requiring Defendants to cease the noxious emissions from the fire(s). Plaintiffs further request that the Court issue and Order requiring Defendants to establish and implement comprehensive testing and cleanup protocols for real property within the geographic boundaries of the Class defined above. Plaintiffs also requests that testing and cleanup protocols be sufficient to detect and remediate elevated levels of hazardous materials or toxic chemicals on Plaintiffs' and the Class members' properties, and in the soils and water surrounding their properties.

### Count 8: Medical Monitoring

148.    As detailed above, Plaintiffs and the Class members may have been exposed to hazardous materials and toxic chemicals as a result of the fire(s).

149.    As a direct and proximate result of this exposure to Defendants' unlawful discharges, Plaintiffs and the Class members may have a significantly increased risk of developing cancer and other latent diseases, making periodic diagnostic medical testing reasonably necessary.

150.    Early diagnosis and treatment of diseases provides significant value for Class members because it will help monitor and minimize the harm caused by Defendants' misconduct and provide Class members with the ability to monitor diseases caused by Defendants' misconduct.

151.    Monitoring procedures exist to make early detection of cancers and other latent disease possible and beneficial. These monitoring procedures are different from the tests and procedures normally recommended in the absence of toxic exposures and are reasonably necessary due to the Class members' potential exposures to hazardous substances released by the fire(s).

152.     Medical monitoring to facilitate early detection of these diseases is necessary to protect the health and well-being of the individual Plaintiffs and Class members. Periodic physical examinations and diagnostic testing will reduce the risk of severe illness and allow early medical intervention to address detected problems early in the disease process, improving the chances for survival and the long-term well-being of those affected.

153.    This exposure to hazardous substances requires the establishment of a comprehensive medical-monitoring program to ensure that the harms occasioned by Defendants' misconduct are mitigated to the extent possible.

154.    Plaintiffs assert no claims for physical manifestation of bodily injury arising from the fire(s) and have no adequate remedy at law. Declaratory, injunctive, or other equitable relief is thus appropriate.

155.    Plaintiffs request injunctive relief in the form of a Court-supervised medical-monitoring program funded by Defendants. The specifics of the medical-monitoring program are a subject for the Court to determine, following a hearing.

**RESERVATION OF RIGHT TO AMEND TO INCLUDE CLAIM FOR PUNITIVE DAMAGES**

156.    Plaintiff reserves the right to amend this Complaint to state a claim for punitive damages under Fla. Stat. § 768.72 following reasonable period of discovery.

**REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests the following relief:

a.    For an order certifying the Class and appointing Plaintiffs as class representatives, and appointing the lawyers and law firms representing Plaintiffs as class counsel, with Mr. Sanders and Mr. Kaplan serving as co-lead class counsel;

b.    Entry of judgment in favor of Plaintiffs and the Class on all counts;

c.    For all recoverable compensatory, statutory, and other damages, including remediation costs, sustained by Plaintiffs and the Class, including all relief allowed under applicable law;

d.    For payment of attorneys' fees and expenses as may be allowable under applicable laws;

e.    For both pre-judgment and post-judgment interest on any amounts awarded;

f.    For injunctive and declaratory relief as allowed by law, including the following:

i.    Ordering Defendants to halt and cease the emission of dangerous and toxic fumes, smoke, liquid effluent, and orders for the Facilities;

ii.    Ordering Defendants to allocate sufficient funds to conduct a complete scientific investigation of the extent and nature of the air, soil, and water contamination that has swept across Miami-Dade County, Florida, and South Florida;

       iii.      Ordering Defendants to pay the costs to remediate the harm inflicted on Plaintiffs' and the Class members' property as a result of the fire(s); and,

       iv.      Ordering Defendants to implement a medical-monitoring program following a hearing.

   g.      Such other and further relief as this Court may deem just and proper.

Respectfully submitted this 3rd day of March 2023,

*/s/ Bruce C. Kaplan*
Bruce C. Kaplan
Kaplan & Kaplan International Law Firm, LLC
10181 NW 58th Street, Suite 15
Doral, Florida 33178
(305) 407-2420
bkaplan@kaplan.attorney
Florida Bar #: 869309

Perry R. Sanders, Jr.
The Sanders Law Firm
31 N. Tejon, Suite 400
Colorado Springs, CO 80903
(719) 630-1556
perry@perrysanders.com
Louisiana Bar #: 01577
*Pro hac vice admission to be petitioned upon assignment of case number and Judge*