**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:23-cv-20861-LEIBOWITZ/AUGUSTIN-BIRCH**

**RABBI AVROHOM BRASHEVITZKY**
**and MARIA ALEJANDRA DURAN**,

     *Plaintiffs,*

*v.*

**REWORLD HOLDING**
**CORPORATION,** *et al.*,

     *Defendants.*

_____/

**<u>ORDER</u>**

     **THIS CAUSE** is before the Court on Defendants' Motion to Strike or Exclude Plaintiffs' Expert Declarations (the "Motion") [ECF No. 121].  The Court held an Evidentiary Hearing on Defendants' Motion to Strike or Exclude Plaintiffs' Expert Declarations [ECF No. 121] on July 19, 2024, at which counsel for Plaintiffs and Defendants appeared.  [*See* ECF No. 144].  For the reasons stated below, Defendants' Motion to Strike or Exclude Plaintiffs' Expert Declarations [ECF No. 121] is **GRANTED IN PART and DENIED IN PART**.

I.     **Background**

     On March 3, 2023, Plaintiffs individually and on behalf of all other similarly situated in Miami-Dade County brought this action against Covanta Holding Corporation, Covanta Dade Renewable Energy, LLC, EQT Infrastructure Corporation, and EQT Infrastructure V.  [ECF No. 1 at 1].  Plaintiffs filed the Second Amended Complaint on September 11, 2023 against Covanta Dade Renewable Energy, LLC and Covanta Holding Corporation[1] ("Defendants").  [ECF No. 75].

_____

[1]     On May 2, 2024, Defendants filed a notice of name change [ECF No. 126] and are now known as Reworld Dade, LLC and Reworld Holding Corporation.

Plaintiffs seek damages from Defendants arising from Covanta's failure to prevent, contain, and extinguish the fire that occurred at the Miami-Dade County Resources Recovery Facility from February 12, 2023, through approximately March 2, 2023.  [*Id.* at 1].

On April 8, 2024, Defendants filed their Motion to Strike or Exclude Plaintiffs' Expert Declarations (the "Motion") [ECF No. 121].  In their Motion, Defendants argue that Plaintiffs' expert declarations of Dr. Timothy McAuley, Dr. Benjamin Hoffman, and Mr. Robert Bowcock do not satisfy Rule 702 of the Federal Rules of Evidence and that Plaintiffs' expert declarations of Mr. Robert Bowcock and Mr. Charles Safdie do not satisfy the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure.  [ECF No. 121 at 6].

## II.     Applicable Legal Standards

### A.     Disclosure of Expert Reports

Under Rule 26(a)(2) of the Federal Rules of Civil Procedure, testifying experts must timely disclose a written report that contains:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  Courts strike expert opinions that do not comply with these requirements. *See, e.g.*, *Am. Gen. Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1311–12 (N.D. Ga. 2008)

(striking expert report that did not identify compensation or provide a list of publications or cases); *Morton's of Chi./Miami, LLC v. 1200 Castle 100-A, Inc.*, 2014 WL 11944282, at *3 (S.D. Fla. Sept. 22, 2014) (striking untimely expert disclosure).

## B.     Admissibility of Expert Opinions

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible only if it is both reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).  Expert testimony is admissible under Rule 702 if "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (internal quotation marks and citation omitted). These criteria are known as "qualification, reliability, and helpfulness." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

Trial courts must act as "gatekeepers" to ensure that expert opinions meet the standards for admissibility and that "speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife*

*Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).  The proponent of expert testimony bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence.  *Hendrix ex rel. G.P. v. Evenflo Co., Inc. (Hendrix II)*, 609 F.3d 1183, 1194 (11th Cir. 2010).  Although there is overlap, courts and litigants alike "must take care not to conflate" these criteria.  *See Frazier*, 387 F.3d at 1260.

## 1.    Qualification

An expert must be qualified to testify to meet the first *Daubert* requirement.  An expert may be qualified based on "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *Frazier*, 387 F.3d at 1261.  The standard for qualification is not stringent, and an expert need only be minimally qualified in his or her field.  *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix II*, 609 F.3d at 1183.  Qualification "is assessed in reference to the matter to which the expert seeks to testify—i.e., 'to the task at hand.'"  *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 597).  "It is for that reason that expertise in one field does not qualify a witness to testify about others."  *Id.* (internal quotation marks and citations omitted).

## 2.    Reliability

An expert's methodology must be sufficiently reliable to meet the second *Daubert* requirement.  A court must assess "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue."  *Chapman*, 766 F.3d at 1306 (internal quotation marks and citation omitted).  The court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation by a genuine scientist."  *Id.* (internal quotation marks and citation omitted); *see also McClain*, 401 F.3d at 1244 (explaining that an "expert's assurances that he has utilized generally accepted scientific methodology are insufficient" and that a court must do more than simply take "the expert's word for it" (alteration, internal quotation marks, and citation omitted)).

In *Daubert*, the Supreme Court identified a list of factors to guide assessment of an expert's methodology:  (1) whether the expert's scientific method, technique, or theory can be objectively tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error of the method; (4) the existence of standards and controls; and (5) whether the method, technique, or theory has been generally accepted in the scientific community.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S. at 592–95; *Hendrix II*, 609 F.3d at 1194. These factors are meant to help with the assessment, but they are not a definitive or exhaustive checklist.  *See Kumho Tire*, 526 U.S. 137 at 151.  All five factors may not even apply each time the reliability of expert testimony is challenged.  *Id.* at 150.

A court may consider the additional factors of whether the opinion was created for the purpose of litigation and whether the expert stands to benefit financially from his or her testimony. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999); *Lust By & Through Lust v. Merrell Dow Pharms.*, Inc., 89 F.3d 594, 597 (9th Cir. 1996) (noting that an expert was a plaintiff's witness in a different case at the time he published his article and presuming he was "influenced by a litigation-driven financial incentive").  Importantly, an opinion is not reliable when there is "too great an analytical leap between the [supporting] data and the opinion proffered."  *Hendrix II*, 609 F.3d at 1194 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004); *c.f. Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

A court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and whether the factors "are reasonable measures of the reliability of expert testimony."  *Kumho Tire*, 526 U.S. at 152.  But there are still limits on the court's

discretion.  The court's role is not to "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 3.    Helpfulness

An expert's testimony must be helpful to meet the third *Daubert* requirement.  To be helpful, expert testimony must fit the facts of the case.  *McDowell*, 392 F.3d at 1298–99; *Allison*, 184 F.3d at 1312.  To do so, it must "logically advance[ ] a material aspect of the case" and "assist the trier of fact." *McDowell*, 392 F.3d at 1299 (internal quotation marks and citation omitted).  "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591 (internal quotation marks and citation omitted).  Expert testimony that "offers nothing more than what lawyers for the parties can argue in closing arguments" generally will not assist the trier of fact and will be excluded.  *Frazier*, 387 F.3d at 1262–63.

Just as an opinion is unreliable if it is based upon an analytical leap that is too great between the underlying information and the proffered opinion, there is not a "fit" for purposes of the helpfulness prong when "a large analytical leap must be made between the facts and the opinion." *McDowell*, 392 F.3d at 1298–99 (citing *Joiner*, 522 U.S. at 146).[2]  An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *Id.* at 1300.

A party's failure to establish the first or second prong obviates the need to proceed to the next prong; the proffered expert testimony is not admissible without satisfying all three prongs.  *See Hendrix*

---

[2]    Because courts consider "analytical leaps" under both the reliability and helpfulness prongs of *Daubert*, this Court considers analytical leaps under both prongs as well.

*II*, 609 F.3d at 1194 ("The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies *each prong*." (emphasis added; citation omitted)).

### III.    Dr. Timothy R. McAuley

Dr. McAuley is "an expert in the fields of air quality and human health exposure and risk assessment." [ECF No. 121-3 ¶ 1].  He has a Ph.D. in environmental science and engineering from Clarkson University, a M.S. in chemistry from Clarkson University, and a B.S. in biochemistry from The College of Saint Rose.  [*Id.* at 13].  He is "a frequent lecturer and industry consultant on topics related to environmental disasters such as mass fires that impact a group of citizens and homes in a defined area," and he has "more than 20 years of experience studying and opining on particulate matter and exposures to such based on environmental variables and distance to the exposure site."  [*Id.*]. Based on his background in exposure science, Dr. McAuley was asked to "analyze the wind plume that would have dispersed the known toxins produced by this fire to determine the geographic area that would have been materially impacted by the Doral fire."  [*Id.* ¶ 4].  Based on the specific toxins identified by Dr. Benjamin Hoffman (discussed below), Dr. McAuley was asked to "determine the approximate distances that each toxin could travel to further analyze the need for appropriate remediation." [*Id.*].

Dr. McAuley's expert declaration seeks to offer five expert opinions:

> 1.     The strength of the fire and length of burn time of the fire yielded significant dispersion and deposition across a specified Contamination Area, with an estimated plume minimum width of 2 miles closer to the facility with a larger width of 5 miles further away;
> 2.     Air quality was very dangerous for several weeks given the environmental toxins that were elevated in the ambient air resulting from the fire;
> 3.     Air quality impacts to the various environmental toxins were not solely related to ambient air quality, but air quality impacts resulting from penetration of gases and particulate matter from the fire into the building envelopes of all buildings and property contained in the specified Contamination Area including their HVAC systems;

4. There will be multiyear impacts to soil resulting from the various dioxins and furans that deposited across the regions given the 60-80 year life span that these compounds have when bound to soil and while migrating through soil into other sensitive environmental areas and yielding highly toxic and dangerous conditions for those living in those areas; and

5. Dispersion and deposition of various environmental toxins would have impacted the air quality to tens of thousands of citizens found within the plume areas, which does and will continue to create environmental health hazards as just for the dioxins and furans alone there is going to be several years of toxic conditions, which does not include the likelihood of other highly toxic compounds likely also in the soil. [*Id.* ¶ 35].

In their Motion, Defendants seek to strike these opinions on the basis that they "are unreliable, are not based on sufficient facts and data, and are not helpful to the trier of fact." [ECF No. 121 at 8].

There is no dispute about the qualifications prong; Defendants do not contest Dr. McAuley's qualifications. An expert may be qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Frazier*, 387 F.3d at 1261. The standard for qualification is not stringent, and an expert need only be minimally qualified in his or her field. *See Hendrix*, 255 at 578, *aff'd sub nom. Hendrix II*, 609 F.3d at 1183. Qualification "is assessed in reference to the matter to which the expert seeks to testify—i.e., 'to the task at hand.'" *Moore*, 995 F.3d at 854 (quoting *Daubert*, 509 U.S. at 597). Even though Defendants do not contest Dr. McAuley's qualifications, the Court explicitly finds him qualified to testify to the task at hand. From Dr. McAuley's curriculum vitae [ECF No. 121-3 at 13], and having heard him testify at the hearing, it is clear to the Court that Dr. McAuley has the appropriate training, education, and experience to testify competently on the matters in his opinions—matters related to air quality, particular matter, environmental toxicology, and exposure science.

Defendants argue, however, that "Dr. McAuley's opinions regarding the February 2023 fire, which he admits are based solely on average wind direction over a 2.5-week period (ignoring wind and fire intensity variability) and his general understanding of dispersion, are speculative and unreliable."

[ECF No. 121 at 12].  The Court will consider the reliability and helpfulness, if applicable, of each opinion in turn.

### Dr. McAuley's First Opinion

Dr. McAuley's first opinion is that the strength of the fire and length of burn time of the fire yielded significant dispersion and deposition across the specified Contamination Area with an estimated plume minimum width of 2 miles closer to the facility with a larger width of 5 miles further away.  [ECF No. 121-3 ¶ 35].  The specified Contamination Area is defined as "directly downwind of an area of at least 5-miles with a plume width close to the facility of at least 2-miles that widened further from the facility."  [*Id.* ¶ 7].  Defendants argue that "[t]his opinion should be excluded because it has no scientific basis."  [ECF No. 121 at 14].  In support of this, Defendants contend that Dr. McAuley "has not conducted any sampling, modeling, or other impact assessment, despite also opining on their necessity 'to properly isolate and quantify the impacts of the fire on the surrounding communities.'"  [*Id.* at 13].  While it is true that Dr. McAuley has not conducted any sampling or performed an air quality impact assessment, he did conduct a weather analysis to help him determine the specified Contamination Area.  [*See generally* ECF No. 121-3].  In his declaration, Dr. McAuley stated the following:

> I conducted a detailed weather analysis that mapped the wind speeds and wind direction during the several weeks of the fire. Changes in the wind speed and direction resulted in an increased plume width from the Covanta facility to various locations that were downwind (i.e., Northwest, West, and Southwest of the facility). The detailed meteorological analysis showed winds came both from the Northeast blowing Southwest and Easterly and Southeasterly winds that blew Northwest. These are both directions that would have impacted not only the two named plaintiffs, Avorhom Brashevitzky (located Southwest of the Covanta facility) and Maria Duran (located Northwest of the Covanta facility), but thousands of others as well in those directions that live in the plume, work in the plume, and/or both work and live in the plume. Therefore, based on the weather analysis and a fluent understanding of air movement of gases, particulates, and various other environmental toxins dispersing vertically and horizontally from the start and throughout the burn period, the toxic plume width is best described by the Contamination Area shown in the following map:



[ECF No. 121-3 ¶ 8].

Relying on their proffered expert, Dr. Thomas McHugh, Defendants argue "that Dr. McAuley 'did not follow any scientifically-accepted analytical process' or conduct a reliable, reproducible analysis because 'it is not possible to accurately define an area of contamination based solely on an evaluation of wind data and personal knowledge of transport and deposition.'" [ECF No. 121 at 15]. In support of their argument that Dr. McAuley's "wind rose" analysis is unreliable, Defendants argue that Dr. McAuley's "downwind plume area is inconsistent with the average wind direction he shows," because "when the fire was most intense, the wind was predominantly blowing toward the east and southeast—*away* from the downwind plume area and the named Plaintiffs' residences." [*Id.*].

Even if Defendants are right that that there are inconsistencies in Dr. McAuley's weather analysis and his description of the plume areas, "experts and their opinions need not be perfect to be admissible." *See Tall v. Fed. Ins. Co.*, No. 6:20-cv-1125, 2021 WL 7629423, at *3 (M.D. Fla. May 5, 2021). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Plaintiffs argue that Dr. McAuley used a reliable scientific

methodology and point out that "in his declaration in response to Defendants' Motion to Strike, Dr. McAuley provided links to no fewer than nine articles discussing the use of wind rose analysis as a scientifically accepted methodology in such cases." [ECF No. 148 at 8].  The Court finds that Dr. McAuley's use of a wind rose analysis is based on a sufficiently reliable methodology, and any flaws in his analysis that Defendants point out are fodder for cross-examination and are not a reason to exclude this proffered opinion.

However, Dr. McAuley's determination of the specified Contamination Area is part of his first opinion, and the determination of the specified Contamination Area requires more than a wind rose analysis to have the proper foundation of reliability.  Dr. McAuley states that "based on the weather analysis and a fluent understanding of air movement of gases, particulates, and various other environmental toxins dispersing vertically and horizontally from the start and throughout the burn period," he can determine the Contamination Area.  [ECF No. 121-3 ¶ 8].  What is not clear to this Court, however, is precisely *how* Dr. McAuley's weather analysis in addition to his understanding of air toxin dispersion allowed him to determine the Contamination Area.  An expert cannot rely on "experience" without explaining in detail how the experience and other materials consulted support the opinion rendered.  *See Frazier*, 387 F.3d at 1265.  Because the Court's "gatekeeping function requires more than simply taking the expert's word for it," the burden is on the party offering the expert testifying based on experience "to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case."  *Id.* at 1261, 1265.  Courts are cautioned not to admit speculation, conjecture, or inference and a court properly excludes expert opinion when a "leap from data to opinion [is] too great."  *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).

11

Here, Dr. McAuley has not explained sufficiently how his understanding of air movement of gases, particulates, and various other environmental toxins allowed him to conclude where the Contamination Area was based on his weather analysis. Plaintiffs have not put anything before the Court that is objectively verifiable (or disconfirmable) regarding the specified Contamination Area. Therefore, the Court finds that Dr. McAuley may not opine on the specified Contamination Area because his weather analysis alone does not yield any such specific area of contamination—only the *ipse dixit* of Dr. McAuley does. Thus, Dr. McAuley may testify as to his weather analysis, which allows him to opine on the wind speed, wind direction, and general direction of dispersion and deposition; however, he may not testify to the second part of his opinion as to the specified Contamination Area because he has not adequately explained how his experience and expertise supports his determination of the specified Contamination Area. For these reasons, Dr. McAuley's first opinion is partially excluded.

### Dr. McAuley's Second Opinion

Dr. McAuley's second opinion is that air quality was very dangerous for several weeks given the environmental toxins that were elevated in the ambient air resulting from the fire. [ECF No. 121-3 at 12]. Defendants argue that Dr. McAuley's second opinion is not supported by scientific assessment or data because he has not conducted any scientific analysis. [ECF No. 121 at 12]. In his deposition, Dr. McAuley testified that he reviewed "CTH reports, Tetra Tech reports, [and] EPA reports" but that "[t]here wasn't actually an assessment," and his review "was just to get a general base of familiarity but no analysis was done, nothing else was written up, [it] was just for [him] to get an understanding." [ECF No. 121-8 (McAuley Dep. Tr.) at 79:10–11, 79:23–24, 80:7–11]. Dr. McAuley also testified that "PM2.5, from what [he has] preliminar[il]y seen, is significantly elevated[.]" [*Id.* at 104:10–12].

Dr. McAuley has not yet compared the PM2.5 levels he has seen with background concentrations for PM2.5.  [*See* ECF No. 121-3 ¶ 25; ECF No. 121-8 (McAuley Dep. Tr.) 73:19–25]. In fact, one of the first steps of his air quality impact assessment is to evaluate "[a]vailable environmental air quality data (i.e., particulates) … to gather insight into typical background particulate concentrations that will be compared before, during, and post Covanta Fire period within the plume area."  [ECF No. 121-3 ¶ 25].  Given that Dr. McAuley only reviewed CTH reports, Tetra Tech reports, and EPA reports to help his general understanding and not to conduct analysis, it appears that Dr. McAuley's opinion that the air quality was very dangerous is based on the fact that there were elevated PM2.5 levels.  At the time of his declaration and during his deposition, Dr. McAuley had not yet conducted an analysis to determine what background concentrations were for PM2.5 to conclude that the levels were actually significantly elevated.  [*See id.*; ECF No. 121-8 (McAuley Dep. Tr.) 73:19– 25].  It was not until the hearing that Dr. McAuley testified that "he had determined background levels for PM2.5 for the entire Miami-Dade County region."  [ECF No. 148 at 6].

Because this information was not disclosed until the hearing, the Court will not consider the new basis supporting Dr. McAuley's opinion.  *See Mitchell v. Ford Motor Co.,* 318 F. App'x 821, 825 (11th Cir. 2009) (holding that the district court did not abuse its discretion in granting a motion to strike the bases in support of an expert's "testimony that were bases first disclosed during and following the *Daubert* hearing and not specifically referred to earlier in the Rule 26(a) report or the deposition").  While it may be the case that PM2.5 levels were significantly elevated, without comparing the PM2.5 levels to PM2.5 background concentrations to determine whether the levels were actually elevated, the Court finds there is too great of an analytical gap between Dr. McAuley's incomplete analysis in his declaration and his opinion to be admissible at trial.  *See Cameron v. Peach Cnty., GA,* No. 5:02-CV-41-1, 2004 WL 5520003, at *11 (M.D. Ga. June 28, 2004); *KW Plastics v. U.S. Can Co.,* 131 F. Supp. 2d 1289, 1292 (M.D. Ala. 2001) (noting that the court's "gate-keeping function

requires more than simply taking the expert's word for it"); *Joiner*, 522 U.S. at 146 ("[A] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"). The Court accordingly finds Dr. McAuley's opinion regarding the dangerous air quality due to elevated levels of environmental toxins to be unreliable and therefore inadmissible under Rule 702.

### Dr. McAuley's Third Opinion

Dr. McAuley's third opinion is that air quality impacts to the various environmental toxins were not solely related to ambient air quality, but air quality impacts resulting from penetration of gases and particulate matter from the fire into the building envelopes of all buildings and property contained in the Contamination Area including their HVAC systems.  [ECF No. 121-3 ¶ 35].  In his declaration, Dr. McAuley provides an outline of the air quality impact assessment that he will conduct. He states that he "will provide a detailed and fully comprehensive and reproducible and defensible assessment of the air quality impacts that resulted from the Covanta fire."  [*Id.* ¶ 24].  His Covanta Fire Elevated Air Toxins Assessment will "collect Tape Lift samples at various downwind and upwind locations that will then be analyzed via Scanning Electron Microscopy to determine composition and morphology of the material collected on the samples."  [*Id.* ¶ 29].  "If available, any of the plaintiffs' homes that have HVAC filters that were contaminated will also be tested and compared to results of the Tape Lift samples collected upwind and downwind."  [*Id.* ¶ 31].  Dr. McAuley testified in his deposition that "[t]here has not been an actual design" and "no parameters that have been set" yet for his air quality impact assessment.  [ECF No. 121-8 (McAuley Dep. Tr.) at 64:4–6].

It is not sufficient, as a basis to support admission of expert opinion, for Dr. McAuley to state what he *will do later on*, when it is clear from the Scheduling Order [ECF No. 63] that class discovery closed on March 5, 2024.  Dr. McAuley's declaration was submitted in support of class certification, and at this stage of the litigation, the Court requires more than a proposed methodology.  *See Morgan v. Orlando Health, Inc.*, No. 6:17-cv-1972-Orl-41GJK, 2019 WL 7423514, at *5 (M.D. Fla. Oct. 23,

2019), objections overruled, 2021 WL 12100347 (M.D. Fla. Dec. 8, 2021) ("Because [the expert] has not performed the method he proposes, the Court cannot evaluate whether the method that provides evidence for class certification can be tested and was subjected to peer review, whether the potential error rate can be ascertained, and whether his method is generally accepted in the scientific community.")

Thus, Plaintiffs have not shown that Dr. McAuley *relied upon* (now, in support of the proffered opinion) any air quality data (such as levels of air toxins) or that any reliable methodology *was applied* in reaching his opinion about air quality impacts *because he has not conducted an air quality impact assessment yet* nor even determined its design. While Dr. McAuley may be correct that there will be air quality impacts to buildings and property contained in the Contamination Area including their HVAC systems, this Court finds there is too great of an analytical gap at present between Dr. McAuley's proposed methodology and his opinion to be admissible at this trial. *See Cameron*, 2004 WL 5520003 at *11; *KW Plastics*, 131 F. Supp. at 1292 (noting that the court's "gate-keeping function requires more than simply taking the expert's word for it"); *Joiner*, 522 U.S. 136 at 146 ("[A] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"). The Court accordingly finds Dr. McAuley's opinion regarding the air quality impacts buildings and property contained in the Contamination Area to be unreliable and therefore inadmissible under Rule 702.

### Dr. McAuley's Fourth Opinion

Dr. McAuley's fourth opinion is that there will be multiyear impacts to soil resulting from the various dioxins and furans that deposited across the regions given the 60-80 year life span that these compounds have when bound to soil and while migrating through soil into other sensitive environmental areas and yielding highly toxic and dangerous conditions for those living in those areas. [ECF No. 121-3 ¶ 35]. There is a critical deficiency here, however: Dr. McAuley concedes that he has not conducted any soil testing to support his opinion. In his declaration, he states that "soil and

water samples at each home at various distances both upwind and downwind will be collected. At least 2 soil and 2 water samples will be collected and analyzed for various air toxins (e.g., Dioxins, Furans, burning waste related VOCs, SVOCs, and PAHs)." [ECF No. 121-3 ¶ 33].

In short, Plaintiffs have not shown that Dr. McAuley relied upon *any* soil data or that any reliable methodology was applied in reaching his opinion about multiyear impacts to the soil—because he has not conducted any soil testing yet or considered any soil data. [*Id.*; ECF No. 121-8 (McAuley Dep. Tr.) at 101:14–21, 103:3–6]. For the same reason that the Court will not allow Dr. McAuley's third opinion, the Court will not permit Dr. McAuley to offer his fourth opinion. Without having done any soil testing or pointing to any soil data, Dr. McAuley's opinion is pure conjecture. This is the type of opinion that Rule 702 was intended to keep out, and Dr. McAuley will not be permitted to tender this opinion at trial.

### Dr. McAuley's Fifth Opinion

Dr. McAuley's fifth opinion is that dispersion and deposition of various environmental toxins would have impacted the air quality to tens of thousands of citizens found within the plume areas, which does and will continue to create environmental health hazards as just for the dioxins and furans alone there is going to be several years of toxic conditions, which does not include the likelihood of other highly toxic compounds likely also in the soil. [ECF No. 121-3 at 12].

But once again, Dr. McAuley has not conducted an air quality impact assessment or any soil testing to support his opinion. Plaintiffs have not shown that Dr. McAuley relied upon any air quality data or soil data or that any reliable methodology was applied in reaching his opinion about any impacts to air quality or the soil—because Dr. McAuley has not conducted an air quality impact assessment or done any soil testing. For the same reason that the Court will not allow Dr. McAuley's third and fourth opinions, the Court will not permit Dr. McAuley to offer his fifth opinion. Without having done an air quality impact assessment or soil testing, Dr. McAuley's fifth opinion is pure

conjecture.  The Court accordingly finds Dr. McAuley's opinion regarding the air quality and soil impacts to be unreliable and therefore inadmissible under Rule 702.

Thus, the Court excludes part of Dr. McAuley's first opinion and entirely excludes his second, third, fourth, and fifth opinions because they are unreliable.

## IV.    Dr. Benjamin Hoffman

Dr. Hoffman is a medical doctor with a "background is in medicine, toxicology, epidemiology, and public health." [ECF No. 121-1 ¶ 1].  He has a M.D. from the Mount Sinai School of Medicine and a Master's in Public Health (MPH) in epidemiology and toxicology from Yale School of Public Health and Medicine.  [*Id.* at 14].  He has 35+ years of experience in the waste industry.  [*Id.* ¶ 1]. While working for Waste Management, he "oversaw the management of community health concerns regarding health issues resulting from living in the vicinity of a waste facility[,]" which "included designing epidemiologic studies of cancer risk of local communities, coordinating research activities with the US EPA and local, state and federal environmental and health departments and providing guidance on the development of medical monitoring programs for employees and community residents."  [*Id.*].  He has "been hired or retained on numerous occasions to assess health risks from industrial facilities."  [*Id.*].  Dr. Hoffman was "retained by counsel to render a professional opinion regarding whether a medical monitoring program is appropriate for a geographically defined group of people exposed to the toxic smoke from the Doral Incinerator fire."  [*Id.* ¶ 2].

Plaintiffs seek to offer three proffered expert opinions by Dr. Hoffman:

1.    "[B]ased on preliminary information and photographs of the fire and plume, the presence of many air pollutant exceedances in the surrounding area (as reported by US EPA and CTEH) and the population density of the impacted areas, [he] can say to a reasonable degree of certainty that those people who lived, worked, or were otherwise present within the area of the plume had exposure to the smoke from the fire.  In [Dr. Hoffman's] opinion, smoke, gases, and dust from the fire are reasonably certain to have covered large geographic areas surrounding the facility, causing exposure to the plume contents that would then enter homes, office buildings, and automobiles."  [*Id.* ¶ 5].

2.        "[H]ighly toxic substances [are] typically found in a smoke plume from a prolonged structural fire and an uncontrolled burn of solid waste[,]" and "[t]here are also many other toxic air pollutants that may be released into the ambient air from waste fires in general, which includes this fire at the Covanta facility." [*Id.* ¶¶ 8, 10].

3.        "[A]s an expert in the field of toxicology, public health, and medicine, that because the individuals exposed to the plume of the Doral Incinerator fire face an increased risk of cancer due to that exposure, they should undergo a routine medical evaluation for cancer, and follow-on treatment as medically indicated." [*Id.* ¶ 18].

In their Motion, Defendants seek to strike Dr. Hoffman's opinions on the basis that they "are unreliable, not based on sufficient facts and data, [and] are not helpful to the trier of fact." [ECF No. 121 at 19].

As with Dr. McAuley, Defendants do not contest Dr. Hoffman's qualifications. Even so, the Court finds independently, that he is qualified to testify to the task at hand. From Dr. Hoffman's resume [ECF No. 121-1 at 14] and his testimony at the hearing, it is clear to the Court that Dr. Hoffman has the appropriate training, education, and experience to testify competently on the matters in his opinions—matters related to medicine, toxicology, epidemiology, and public health. Thus, the admissibility of his proffered opinions depends upon the reliability and helpfulness factors for each of the three proffered expert opinions.

### Dr. Hoffman's First Opinion

Defendants argue that in forming his first opinion set forth above, "Dr. Hoffman did not use any published or accepted methodology in concluding that smoke from the February 2023 fire 'covered large geographic areas,' making this opinion unreliable and not reproducible." [ECF No. 121 at 20]. Crucially, in support of this opinion Dr. Hoffman explicitly relies upon Dr. McAuley to make the determination of "[t]he geographic distribution of the smoke plume and intensity of impact to area inhabitants[.]" [ECF No. 121-1 ¶ 5]. In other words, Dr. Hoffman explicitly relies upon Dr. McAuley's determination of the specified Contamination Area as an underpinning of his proffered first opinion.

The Court has already determined that Dr. McAuley's opinion on the specified Contamination Area was unreliable. "When an expert, in forming his or her expert opinion, relies upon an unreliable expert opinion, their expert opinion is also unreliable." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1181 (S.D. Fla. 2022). The fact that Dr. Hoffman relies on Dr. McAuley's unreliable opinion as an underpinning of his opinion renders Dr. Hoffman's first opinion unreliable as well. Even if that were not the case, Dr. Hoffman did not conduct an exposure assessment himself to support his opinion. Dr. Hoffman conceded at his deposition that the assessment he did was a "qualitative exposure assessment because there wasn't time to do a full assessment." [ECF No. 121-9 (Hoffman Dep. Tr.) at 89:12–14]. He further testified that "[his] role was to make sure there was exposure" and "[i]n this case there was no doubt in [his] mind there was exposure, which does need to be further evaluated, but that's going to take some time." [*Id.* at 89:16–17, 89:22–25].

The fact that there was not enough time to do an exposure assessment does not excuse the fact that Dr. Hoffman did not conduct one. Even more importantly, Dr. Hoffman's determination that "there was exposure" does not mean that Dr. Hoffman can opine that there was exposure "within the area of the plume," or in "large geographic areas," when there was no exposure assessment conducted by Dr. Hoffman and the Court found Dr. McAuley's determination of the specified Contamination Area to be unreliable. For these reasons, the Court finds Dr. Hoffman's opinion unreliable and therefore inadmissible under Rule 702.

### Dr. Hoffman's Second Opinion

Dr. Hoffman's second opinion is that "highly toxic substances [are] typically found in a smoke plume from a prolonged structural fire and an uncontrolled burn of solid waste" and that "[t]here are also many other toxic air pollutants that may be released into the ambient air from waste fires in general, which includes this fire at the Covanta facility." [ECF No. 121-1 ¶¶ 8, 10]. Defendants argue that "Dr. Hoffman's vague statements that waste fires typically contain 'highly toxic substances' are

not based on accepted toxicological risk assessment methods." [ECF No. 121 at 19]. Defendants also argue that by not naming the "many other toxic air pollutants, … a risk assessment is not possible, and Dr. Hoffman's claims that unspecified chemicals are toxic are untestable." [*Id.*]. In his declaration, Dr. Hoffman states that "EPA and CTEH monitored levels of PM 2.5, volatile organic compounds, chlorine, hydrogen sulfide, hydrogen cyanide, carbon monoxide, and oxygen[, but that] there does not appear to have been more extensive monitoring of other highly toxic substances typically found in a smoke plume from a prolonged structural fire and an uncontrolled burn of solid waste." [ECF No. 121-1 ¶ 8].

While the Court agrees that Dr. Hoffman has not conducted a site-specific assessment as part of this proffered opinion, the proffered opinion is not specific to any area and is bolstered by scientific literature. His declaration states that "[t]here is abundant scientific literature that describes the contents of the smoke that is produced by this type of fire" and that "[t]he common toxic products of combustion of solid wastes and structural fires are chlorine, sulfur dioxide (SO2), nitrogen oxides (NOX), particulates (M 2.5) and variable amounts of other chemicals such as polychlorinated biphenyls (PCBs), numerous dioxins, furans, and heavy metals (such as cadmium, chromium, lead, beryllium, arsenic, nickel, and mercury)." [*Id.* ¶¶ 9, 10].

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility … [.]" *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323 (11th Cir. 2022). To the extent that Defendants have concerns about the literature Dr. Hoffman is relying on or the fact that Dr. Hoffman did not name every toxic air pollutant, Defendants may address that on cross-examination. Thus, the Court finds that Dr. Hoffman's second opinion is reliable. The Court also finds that Dr. Hoffman's opinion is helpful to the trier of fact because it will allow the jury to understand what kinds of toxic substances may have

been released into the air from the fire. Thus, the Court will not exclude Dr. Hoffman's second proffered expert opinion.

### Dr. Hoffman's Third Opinion

Dr. Hoffman's third opinion is that "because the individuals exposed to the plume of the Doral Incinerator fire face an increased risk of cancer due to that exposure, they should undergo a routine medical evaluation for cancer, and follow-on treatment as medically indicated." [ECF No. 121-1 ¶ 18]. Defendants argue that "because no risk assessment has been performed, there is no demonstrated risk of health effects to the public[,]" and therefore, Dr. Hoffman's "opinion is unsupported, unreliable, and not based on sufficient acts or data." [ECF No. 121 at 21].

Dr. Hoffman was asked in his deposition whether there was any data that he could point to that supports his conclusion that individuals exposed to the plume face an increased risk of cancer. [ECF No. 121-9 (Hoffman Dep. Tr.) at 129:11–15]. In response, Dr. Hoffman stated that "the EPA data and the CTEH data needs to be carefully looked at and looked at wind direction of the fire … we need to look to see how the monitoring was done. The types of equipment that was used. The sensitivity of the equipment. The errors of the equipment. All that is normally done in an exposure assessment. There has not been the time to do that." [*Id.* at 129:16–130:2]. Thus, the Court agrees that Dr. Hoffman has not conducted any assessment to determine cancer risk, and without such an assessment he relies solely on his experience and *ipse dixit* to make this determination.

The Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (2000 amends.)

(emphasis added); *see also Frazier*, 387 F.3d at 1261 ("[E]xperience, standing alone, is [not] a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.").

In his deposition, Dr. Hoffman testified that "[a]ll I can tell you, having done this for a long time, if I was a person who was exposed to that smoke for three weeks coming into my home, because I had no place else to go and I wasn't—maybe not necessarily the most healthy person in the world, I would definitely be concerned that I had a problem, that I could potentially develop a problem." [ECF No. 121-9 (Hoffman Dep. Tr.) at 130:12–19]. Simply relying on the fact that he has done this for a long time is not sufficient to support his proffered opinion. The proffered opinion suffers from the same defect as many of Dr. McAuley's, in that it relies upon what will be done instead of what was done. Dr. Hoffman has failed to explain how "his experience" leads to his site-specific conclusion that individuals "exposed to the plume" face an increased risk of exposure and should undergo a routine medical evaluation for cancer. The Court cannot (and will not) just take Dr. Hoffman's word for it and must exclude this opinion.

The Court will allow Dr. Hoffman to offer his second opinion and will exclude Dr. Hoffman's first and third opinions because they are unreliable.

## V.   Robert Bowcock

Mr. Bowcock's "background is in water resource management, with several water industry licenses, including California Grade V Water Treatment Operator." [ECF No. 121-5 ¶ 1]. Mr. Bowcock was "retained by counsel to render an opinion regarding the sampling [he] performed around the Miami-Dade County Resources Recovery Facility, operated by Covanta. This sampling showed a discernible toxic footprint[.]" [*Id.* ¶ 2].

Plaintiffs submitted two declarations for Mr. Bowcock. [*See* ECF Nos. 121-4, 121-5]. The first declaration is dated February 5, 2024 [ECF No. 121-5 at 4], and was submitted in accordance with this Court's Scheduling Order requiring that the parties exchange expert witness summaries or

reports on issues of class certification by February 5, 2024 [ECF No. 63 at 1]. The second declaration [ECF No. 121-4] was submitted with Plaintiffs' class certification motion after the February 5, 2024, deadline. [*See* ECF No. 121 at 22]. In both declarations, Mr. Bowcock opines that "[his] sampling suggests a discernible toxic footprint significant to cause high levels of exposure to inhabitants located in the Plume contaminated area." [ECF No. 121-4 ¶ 7, 121-5 ¶ 7]. The difference between the first and second declaration is that in his second declaration, Mr. Bowcock states a new opinion in paragraph nine and submits 15 additional pages of data after his declaration. [*See* ECF No. 121-4 at 3, 6–20]. His new opinion in his second declaration is that "[d]ioxins cause a spectrum of morphological and functional developmental deficits including fetal death, thymic atrophy, birth defects (structural malformations), delayed effects on the genitourinary tract, adverse behavioral effects, and developmental delay." [*Id.* ¶ 9].

Defendants first argue that Mr. Bowcock's second declaration should be stricken because it was filed after the February 5, 2024, deadline to disclose expert reports. [ECF No. 121 at 22]. Plaintiffs argue in response that the second declaration was a clerical error, and the first declaration disclosed to Defendants on February 5, 2024, is the correct version. [ECF No. 123 at 18–19]. Therefore, the Court will strike Mr. Bowcock's second declaration [ECF No. 121-4], and the Court will only consider Mr. Bowcock's first declaration [ECF No. 121-5] for purposes of this Motion.

Defendants also argue that Mr. Bowcock's declaration does not satisfy Rule 26 or Rule 702 requirements. [ECF No. 121 at 22]. Defendants argue that Mr. Bowcock's declaration does not comply with Rule 26's basic disclosure requirements because Mr. Bowcock failed to identify his publications, the cases in which he testified, or the basis for his opinions. [*Id.* at 19]. His declaration also did not include his qualifications or a statement of his compensation. [*Id.*]. Plaintiffs argue in response that even if there was a technical violation of Rule 26(a)(2)(B), the Court should decline to

23

strike Mr. Bowcock's declaration because there has been no prejudice to Defendants.  [ECF No. 123 at 19].

Under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, testifying experts must timely disclose a written report that contains:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Mr. Bowcock's declaration does not comply with (i), (ii), (iv), (v), and (vi) of Rule 26 (a)(2)(B). It is unclear what the basis and reasons are for Mr. Bowcock's opinion and what facts or data he considered in forming his opinion since there is no data included.  Mr. Bowcock's declaration also does not include his qualifications, a list of all other cases in which he testified as an expert at trial or by deposition during the previous 4 years, or a statement of his compensation.  Regarding his publications, Plaintiffs argue that Mr. Bowcock did not include those because he has not had any publications in the previous 10 years.  [ECF No. 123 at 19].  Even if that is the case, Mr. Bowcock's declaration was still lacking in his other qualifications, such as his education or years of experience. Thus, Defendants' Motion to Strike Mr. Bowcock's declaration on the basis of Rule 26(a) is valid.

If a party violates Rules 26(a) or (e), Rule 37(c) provides for the exclusion of the expert evidence "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The

non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. *Mitchell*, 318 F. App'x at 824. The Court finds that Plaintiffs failure here to comply with Rule 26 was not substantially justified or harmless. "Plaintiffs have not provided adequate explanation justifying their disclosure of an expert report devoid of the required substance. Indeed, the Report's deficiencies were not minor. The Report failed to satisfy at least [five] of the requirements under Rule 26(a)(2)(B)." *Moore v. GNC, Holdings, Inc.*, No. 12-61703-CIV, 2014 WL 12684287, at *3 (S.D. Fla. Jan. 24, 2014). Similarly, Plaintiffs' arguments as to harmlessness are insufficient. Even if Defendants were able to question Mr. Bowcock about his past cases in which he testified and the bases for his opinions, that does not cure the deficiencies in Mr. Bowcock's declaration. "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony[,]" because "[t]he purpose of Rule 26(a)(2) is to provide notice to opposing counsel-before the deposition-as to what the expert witness will testify and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony." *Id.* at *4 (citing *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (quotation marks omitted)). Therefore, Plaintiffs' Rule 26 violations in Mr. Bowcock's declaration were not harmless, and his testimony should be excluded pursuant to Rule 37(c)(1).

Moreover, even if the deficiencies in Mr. Bowcock's declaration were harmless under Rule 26, the Court would still exclude Mr. Bowcock's testimony under *Daubert* and Rule 702 of the Federal Rules of Evidence. Defendants argue in their Motion that Mr. Bowcock's declaration is not supported by a reliable scientific methodology, and thus does not satisfy Rule 702. [ECF No. 121 at 17–19].

Even though Defendants do not contest Mr. Bowcock's qualifications, the Court finds him qualified to testify to the task at hand. From Mr. Bowcock's curriculum vitae [ECF No. 141-21] and his testimony at the hearing, it is clear to the Court that Mr. Bowcock has the appropriate training, education, and experience to testify competently on the topic of his opinion—matters related to water

resource management. Thus, given Mr. Bowcock is qualified, the Court will consider whether his opinion is supported by a reliable scientific methodology.

Mr. Bowcock opines that "[his] sampling suggests a discernible toxic footprint significant to cause high levels of exposure to inhabitants located in the Plume contaminated area." [ECF No. 121-5 ¶ 7]. His declaration states that "six samples were collected on June 2, 2023 [from the plume area described by Dr. McAuley], maintained in proper containers, received at acceptable temperature, with proper chain of custody for the receiving company, Ceres Analytical Laboratory, Inc. who logged receipt on June 6, 2023." [*Id.* ¶¶ 4, 6]. Defendants argue that "Mr. Bowcock's conclusion that the February 2023 fire emitted 'significantly high levels' of dioxins throughout Dr. McAuley's plumes is not supported by his sampling results or a reliable methodology." [ECF No. 121 at 23]. Mr. Bowcock explained in his deposition his sampling process, including how he selected the sampling locations and what sampling procedures he used, which suggests that his method could be replicated. [ECF No. 121-10 at 41:19–43:23]. However, Mr. Bowcock did not take any background or control samples to determine the typical background concentration of toxins in the area. [*See id.* at 44:6–8]. Therefore, the Court finds that Mr. Bowcock's methodology is not reliable. Mr. Bowcock's conclusion that there was a "discernible toxic footprint," when he did not compare the toxicity levels to background concentrations is the type of *ipse dixit* that is not allowed in district courts. *See McDowell*, 392 F.3d at 1300 (An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions."). Thus, the Court cannot conclude that Mr. Bowcock's methodology is reliable. The Court therefore excludes Mr. Bowcock's expert declaration pursuant to Rule 37(c)(1) for violations of Rule 26 and pursuant to Rule 702.

## VI.   Charles Safdie

Mr. Safdie is "an expert in the field of demographic and population analysis and voting/marketing list development in South Florida." [ECF No. 121-7 ¶ 1]. "Using the data provided

by Dr. McAuley, [Mr. Safdie] was tasked with deriving the number of individuals that would reflect to the highest degree of accuracy the population size within two respective affected areas as described by Dr. McAuley." [*Id.* ¶ 3]. Plaintiffs submitted two declarations for Mr. Safdie. [*See* ECF No. 121-6, 121-7]. The first declaration is dated February 5, 2024 [ECF No. 121-7 at 7] and was submitted in accordance with this Court's Scheduling Order requiring that the parties exchange expert witness summaries or reports on issues of class certification by February 5, 2024 [ECF No. 63 at 1]. The second declaration is dated March 1, 2024 [ECF No. 121-6 at 6] and was submitted with Plaintiffs' class certification motion. [*See* ECF No. 121 at 25].

Defendants argue that Mr. Safdie's second declaration is untimely and should be stricken because it prevented Defendants from having time to adequately rebut and explore the bases for Mr. Safdie's opinion. [*Id.*]. Plaintiffs argue that "Mr. Safdie's [second] declaration simply reduced the numeric representation of the class size to most precisely account for the counters of Dr. McAuley's Contamination Area [and that] [t]here is no meaningful change to his opinions nor harm to Defendants related thereto." [ECF No. 123 at 20].

Rule 26(a)(2)(D) requires parties to disclose expert testimony "at the times and in the sequences that the court orders." Fed. R. Civ. P. 26(a)(2)(D). There is no question that Mr. Safdie's second declaration was disclosed after the February 5, 2024, deadline set by this Court to disclose expert reports. Furthermore, despite Plaintiffs' representations that Mr. Safdie's second declaration did not provide a meaningful change to his opinions, the Court disagrees. Mr. Safdie's first declaration provides that there are a total of 53,927 individuals in the yellow-pie shaped portion of Dr. McAuley's Figure 4 graphic (see above) and 198,878 individuals within the black oval of Dr. McAuley's Figure 4 graphic (again, see above) who were affected by the Covanta fire. [ECF No. 121-7 at 3, 5]. In contrast, Mr. Safdie's second declaration provides that there are 79,021 individuals affected by the Covanta fire in an area described as Figure 1 in Mr. Safdie's declaration. [ECF No. 121-6 at 3–4]. Based on the

substantially different numbers presented in his declarations, Mr. Safdie's opinion significantly changes the population affected by the Covanta fire (in his view).  Thus, the Court finds that Mr. Safdie's second declaration was untimely and submitted a new opinion.

As explained earlier, the non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless.  *Mitchell*, 318 F. App'x at 824.  In making this determination, the Court considers four factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice."  *Torres v. First Transit, Inc.*, No. 17-cv-81162, 2018 WL 3729553, at *2 (S.D. Fla. Aug. 6, 2018) (citations omitted).  "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question."  *Bove v. Pub. Storage*, 106 F. Supp. 3d 1252, 1260 (S.D. Fla. 2015) (citation omitted).

In considering these factors, the Court finds that Mr. Safdie's second declaration should be excluded as untimely.  Plaintiffs provide no justification for Mr. Safdie's untimely second declaration and simply argue that there is no harm to Defendants.  Meanwhile Defendants argue that the untimely disclosure prevented them from having time to adequately rebut and explore the bases for Mr. Safdie's opinion.  [ECF No. 121 at 25].  The Court finds that Plaintiffs failure to submit Mr. Safdie's second declaration in a timely manner was not substantially justified or harmless, and thus, Mr. Safdie's second declaration [ECF No. 121-6] must be excluded.

## VII.    Conclusion

It is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Strike or Exclude Plaintiffs' Expert Declarations [**ECF No. 121**] is **GRANTED IN PART and DENIED IN PART**.

1. Dr. McAuley's declaration [ECF No. 121-3] is partially excluded.  Dr. McAuley may testify as to the first part of his first opinion based on his findings from his weather analysis, but he may not testify as to the second part of his first opinion as to the specified Contamination Area as explained in this Order.  Dr. McAuley's second, third, fourth, and fifth opinions are entirely excluded.

2. Dr. Hoffman's declaration [ECF No. 121-1] is partially excluded.  Dr. Hoffman may offer his second opinion, but Dr. Hoffman's first and third opinions are excluded.

3. Mr. Bowcock's second declaration [ECF No. 121-4] is stricken.  Mr. Bowcock's first declaration [ECF No. 121-5] is excluded.

4. Mr. Safdie's second declaration [ECF No. 121-6] is excluded.

Given this Court's rulings on Defendants' Motion to Strike or Exclude Plaintiffs' Expert Declarations, Plaintiffs' Motion to Certify Class [**ECF No. 118**] and Plaintiffs' Motion to Certify Class Brief on Motion [**ECF No. 119**] are **DENIED WITHOUT PREJUDICE**.  The parties shall meet and confer and propose a briefing schedule to the Court on Plaintiffs' Motion for Class Certification **no later than December 13, 2024.**

**DONE AND ORDERED** in the Southern District of Florida on November 13, 2024.



DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc:      counsel of record